# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

MARK ERDBERG, et al.,      )
                             )
      Plaintiffs,       )
                             )
v.                            )    Case No.: 2:16-cv-01880-SGC
                             )
FIVE BROTHERS MORTGAGE    )
COMPANY SERVICES AND      )
SECURING, INC., et al.,       )
                             )
      Defendants.     )

## MEMORANDUM OPINION[1]

This matter is before the court on the motions for summary judgment filed by the defendants, Cenlar, F.S.B. (Doc. 39); Five Brothers Mortgage Company Services and Securing, Inc. (Doc. 40); and Creditsouth Financial Services, Inc. (Doc. 38). The motions are fully briefed and are ripe for adjudication. (Docs. 41-46). For the reasons explained below, the motions are due to be granted.

## I.    FACTS

This lawsuit concerns residential property located on Cromwell Drive in Mountain Brook, Alabama ("Cromwell Drive" or the "Property"), and purchased by the plaintiffs, Mark and Jaime Erdberg, in March 2016. (Doc. 42 at 3). Plaintiffs did not move into the Property; instead they planned renovations and

---

[1] The parties have previously consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). (Docs. 13, 36).

continued living in a separate residence they owned. (Doc. 42 at 2-3; Doc. 39 at 2). On June 22, 2016, Plaintiffs executed a mortgage loan (the "Mortgage") on the Property from non-party, Bryant Bank. (Doc. 39 at 2; Doc. 42 at 2-3). Plaintiffs informed Anthony Robbins, the Bryant Bank mortgage banker, that their planned renovations were extensive and they would continue living at their other residence until the work at Cromwell Drive was complete. (Doc. 42 at 2; *see* Doc. 42-2 at 3). Plaintiffs and Robbins contend these conversations made it obvious that the renovations at Cromwell Drive would take more than sixty (60) days to complete. (Doc. 42 at 2; Doc. 42-2 at 3). At some point after executing the Mortgage, Plaintiffs decided to demolish the existing house and construct a new one. (Doc. 42 at 2-3).

The Mortgage: (1) allowed the lender—and/or its agents—to "make reasonable entries upon and inspections of" the Property; and (2) required Plaintiffs to occupy Cromwell Drive as their primary residence for one year, beginning within sixty (60) days (the "Occupancy Requirement") of its execution. (Doc. 39-1 at 6). The Mortgage also allowed the mortgage servicer to inspect Cromwell Drive—either because of Plaintiffs' breach or to ensure the Property was being properly maintained—and, if necessary, enter the interior of the house "to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and

have utilities turned on or off." (*Id*.). On August 1, 2016, Bryant Bank transferred the Mortgage to Cenlar, a mortgage servicing company. (Doc. 42 at 3; Doc. 42-4 at 2). The transfer of the Mortgage to did not affect its terms. (Doc. 42-4 at 2).[2]

Plaintiffs made timely Mortgage payments but on September 28, 2016, learned[3] Cenlar believed they had defaulted by failing to make payments. (Doc. 42 at 4). Mr. Erdberg responded on the same day, using his law firm letterhead and providing copies of checks and receipts confirming the Mortgage payments were current. (*Id*.; Doc. 42-5). During this correspondence, no one at Cenlar inquired whether Plaintiffs were residing at Cromwell Drive. (Doc. 42 at 4).

In October 2016, Cenlar contacted Five Brothers, a company which "coordinates securing and preservation services for lenders, mortgagees and mortgage servicers." (Doc. 40 at 2-3). Cenlar requested Five Brothers to conduct an initial "make contact" visit at Cromwell Drive. (*Id.* at 5). Five Brothers, in turn, engaged a non-party contractor to perform the visit. (*Id.*). On October 22, 2016, the contractor visited the Property. (Doc. 40 at 5; *see* Doc. 42 at 4; Doc. 39 at 4). The contractor did not enter the house but inspected and photographed the exterior. The contractor reported Cromwell Drive as vacant, which is obvious from the photos. (Doc. 40 at 5; *see* Doc. 40-2 at 22-25; Doc. 39 at 4). During the

---

[2] A letter to this effect was mailed to Plaintiffs at the Cromwell Drive address. (Doc. 42-4 at 2).

[3] It is unclear how Plaintiffs learned Cenlar believed the Mortgage was in default. (*See* Doc. 42-3 at 3; Doc. 42-6 at 3).

October 22, 2016 inspection, the contractor left a "calling card" on the front door, instructing Plaintiffs to contact Cenlar.  (Doc. 40 at 6; Doc. 40-2 at 17-18, 23).

On October 25, 2016, Cenlar sent a letter to Plaintiffs at Cromwell Drive, noting Cenlar's conclusion the Property was vacant and stating it would protect the house from vandalism and freeze damage by changing locks and taking "reasonable action to protect and preserve" it.  (Doc. 39-3 at 2; Doc. 42 at 5).  The letter further noted that Plaintiffs were required to present any "unusual circumstances" to Cenlar within two business days.  (Doc. 39-3 at 2; Doc. 42 at 5).  On October 28, 2016, Cenlar confirmed it wanted Five Brothers to proceed with securing Cromwell Drive.  (Doc. 40 at 6; Doc. 40-2 at 26).

Five Brothers contracted with Creditsouth to secure the Property.  (Doc. 40 at 7).  Creditsouth is a "property preservation company" which regularly performed initial secures in Jefferson County at the request of Five Brothers.  (Doc. 38 at 3).  On November 1, 2016, Creditsouth conducted an "initial secure" by entering the interior of Cromwell Drive, winterizing the plumbing, changing the locks on the exterior carport door, installing a lockbox, and mowing the yard.  (Doc. 38 at 3-4).  Creditsouth also disconnected the power and water supply to Cromwell Drive and affixed bright orange stickers—announcing the utilities were off and the house was winterized—to the exterior of the carport door and front window.  (Doc. 42 at 5-6).

Plaintiffs arrived at Cromwell Drive later on November 1, 2016, and discovered the orange stickers, the disconnected utilities, and the changed locks. (Doc. 42 at 6). While there, Plaintiffs found Cenlar's October 25, 2016 letter in the mailbox. (*Id.*). Mr. Erdberg called Five Brothers and spoke with an employee; the employee stated the initial secure was performed due to non-payment on the Mortgage. (Doc. 42 at 7-8; *see* Doc. 40 at 8). During the phone conversation, the Five Brothers employee gave Mr. Erdberg the code for the lockbox so Plaintiffs could access the house through the carport door. (Doc. 40 at 8).

On November 7, 2016, Cenlar sent another letter to Cromwell Drive, stating Plaintiffs had defaulted on the Mortgage. (Doc. 42 at 8). After the events giving rise to this lawsuit, Cenlar determined it had misapplied Plaintiffs' Mortgage payments and stated in a letter to Plaintiffs—addressed to Mr. Erdberg's law firm—that it regretted the error. (Doc. 42 at 8). Ultimately, Plaintiffs paid off the loan in full; the Mortgage was released on May 18, 2017. (Doc. 39 at 6).

## II.    PROCEDURAL HISTORY

Plaintiffs filed the initial complaint in this matter on November 22, 2016, naming Five Brothers and Cenlar as defendants and invoking both diversity and federal question jurisdiction. (Doc. 1). Five Brothers answered, and Plaintiffs voluntarily dismissed Cenlar pursuant to Rule 41(a)(1)(A)(i) of the *Federal Rules of Civil Procedure*. (Docs. 7, 8, 9). In April 2017, the court ordered Plaintiffs to

allege diversity jurisdiction more specifically; Plaintiffs responded by requesting leave to file a first amended complaint ("FAC"). (Docs. 19, 20). The court granted the motion, and Plaintiffs filed the FAC on May 1, 2017. (Docs. 22, 23).

The FAC alleged federal jurisdiction solely on the basis of a federal question, reinstated Cenlar as a defendant, and added Creditsouth as a defendant. (Doc. 23). The FAC asserted violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA"), as well as claims for trespass, negligence, wantonness, negligent and wanton training and supervision, and invasion of privacy. Creditsouth answered, and Cenlar responded by filing a motion to dismiss pursuant to Rule 12(b)(6). (Docs. 30, 31). In briefing the motion to dismiss, Plaintiffs conceded their FDCPA, negligence, and wantonness claims against Cenlar. (Doc. 37). As to the remaining claims against Cenlar, the court dismissed the invasion of privacy claim but denied the motion as to trespass. (Doc. 47).

Prior to the court's ruling on Cenlar's motion to dismiss, the defendants filed the instant motions for summary judgment. Briefing on the pending motions has clarified the sole remaining FDCPA claim is asserted against Creditsouth. (*See* Doc. 40-1 at 17; *see generally* Doc. 41). Accordingly, Creditsouth faces all of the claims asserted in the FAC, while Five Brothers faces only the claims for trespass, negligence, wantonness, and invasion of privacy. Following the court's ruling on the motion to dismiss, trespass is the only claim surviving against Cenlar.

## III.  STANDARD OF REVIEW

Under Rule 56(c) of the *Federal Rules of Civil Procedure*, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Id.* at 323.  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by affidavits, depositions, answers to interrogatories, or admissions on file, designate specific facts showing a genuine issue for trial.  *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the

evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

## IV.   DISCUSSION

Each theory of liability asserted in the FAC is addressed in turn.

### A.   <u>Trespass</u>

Under Alabama law, "trespass to property is a wrong against the right of possession or entry." *Boyce v. Cassese,* 941 So. 2d 932, 945 (Ala. 2006). "If a party enters property . . . under a legal right, entry . . . pursuant to that right cannot constitute a trespass." *Id*; *see also Central Parking Sys. v. Steen*, 707 So. 2d 226, 228 (Ala. 1997) (defining trespass as "any entry on the land of another without express or implied authority"). Here, Cenlar contends it cannot be liable for trespass because it—and its agents—had a legal right to enter the Property under the terms of the Mortgage. (Doc. 39 at 7-9; Doc. 45 at 1-4).[4]

Cenlar relies on provisions of the Mortgage: (1) allowing it to inspect and, if necessary, enter the interior of the Property and secure it from damage; and (2) requiring Plaintiffs to occupy Cromwell Drive as their principal residence within sixty days. Specifically, section six of the Mortgage set forth the Occupancy Requirement:

---

[4] Because the defendants' rights to enter the property are governed by the Mortgage—and because Cenlar serviced the Mortgage at all times relevant to this lawsuit—this section of the opinion cites primarily to the briefing on Cenlar's motion and analyzes Cenlar's right to enter the Property.

> Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

(Doc. 39-1 at 6). Section seven of the Mortgage required Plaintiffs to maintain the property and provided, in part:

> Lender or its agent may make reasonable entries upon and inspections of the property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

(Doc. 39-1 at 6). Under portions of section nine, if Plaintiffs failed to perform the covenants in the Mortgage or abandoned the Property:

> Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. . . . Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.

(Doc. 39-1 at 6).

It is undisputed Plaintiffs did not occupy Cromwell Drive within sixty days after executing the Mortgage. On this basis, Cenlar argues Plaintiffs breached the Occupancy Requirement. Therefore, Cenlar contends it had the authority to enter

and secure Cromwell Drive under section nine.  (Doc. 39 at 7-8).[5]  Cenlar argues that, because it had a legal right under the Mortgage to enter and secure the Property, it cannot be liable for trespass.  (*Id.* at 9).

In response, Plaintiffs rely on parol evidence to excuse their admitted failure to comply with the Occupancy Requirement.  (Doc. 42 at 9-13).  Specifically, Plaintiffs rely on conversations they had with Anthony Robbins, the Bryant Bank loan officer who originated the Mortgage, regarding their planned renovations and the implicit understanding that Plaintiffs would not move into Cromwell Drive for more than sixty days.  (*Id.* at 11-12).  Plaintiffs contend parol evidence of this understanding—coupled with supposed ambiguities in the Mortgage—creates a question of fact regarding whether Cenlar trespassed.

As to ambiguities in the Mortgage, Plaintiffs assert the portion of section seven allowing Cenlar to inspect the interior of Cromwell Drive is ambiguous because it requires "reasonable cause."  (Doc. 42 at 10).  Accordingly, Plaintiffs contend they can rely on the oral understanding with the mortgage originator that they were not bound by section six's Occupancy Requirement.  (*Id.* at 10-13).  As Plaintiffs would have it, there is a factual dispute regarding whether Cenlar had reasonable cause to enter Cromwell Drive.  (*Id.* at 12).  Alternatively, even if the Mortgage gave Cenlar the authority to enter Cromwell Drive, Plaintiffs contend

---

[5] Cenlar also asserts an independent right to enter the interior of Cromwell Drive under section seven.  (Doc. 39 at 8-9).

actions associated with securing the Property exceeded the authority and became a trespass. This alternative argument focuses on alleged damage to the carport door and the orange notice stickers. (*Id.* at 15-16).

"Alabama courts have recognized that parol evidence is admissible *to explain,* but not *to contradict ambiguous terms,* and to show fraud or mistake." *Baldwin Cty., Ala. v. Purcell Corp.*, 971 F.2d 1558, 1564 (11th Cir. 1992) (citing *Green Springs Assocs., Ltd. v. Green Springs Village, Ltd.,* 577 So. 2d 872, 875 n.3 (Ala. 1991); *Brookins v. Greater Gadsden Hous. Auth.,* 588 So. 2d 474, 476 (Ala. Civ. App. 1991); *Walker v. Traughber,* 351 So. 2d 917, 920 (Ala. Civ. App. 1977)). Alabama courts construe mortgage agreements as they would any other contract. *Tennant v. Chase Home Fin., LLC*, 187 So. 3d 1172, 1181 (Ala. Civ. App. 2015). "Where a contract, by its terms, is plain and free from ambiguity, there is no room for construction and the contract must be enforced as written." *Austin Apparel, Inc. v. Bank of Prattville,* 872 So. 2d 158, 165 (Ala. Civ. App. 2003).

Plaintiffs' reliance on parol evidence is misplaced. The Occupancy Requirement, which Plaintiffs do not contend is ambiguous, obligated Plaintiffs to move into Cromwell Drive within sixty days. If Plaintiffs breached covenants in the Mortgage—including the Occupancy Requirement—section nine specifically allowed Cenlar to enter the interior of Cromwell Drive and secure it by changing

locks, draining water from pipes, cutting off utilities, and performing other work to protect the value of the Property. Neither section six nor section nine required Cenlar to show reasonable cause to enter the interior of Cromwell Drive. Instead, these provisions gave Cenlar the right to enter and secure Cromwell Drive independently of section seven. Assuming *arguendo* that section seven's "reasonable cause" requirement is ambiguous, the extra-contractual understanding upon which Plaintiffs rely—that they would not occupy Cromwell Drive until after lengthy renovations were complete—does not offer any explanation or clarification regarding the meaning of the term. Accordingly, Plaintiffs' understanding with the Mortgage originator is not competent parol evidence.

Regardless, the conversations upon which Plaintiffs rely are fatally vague. Specifically, Plaintiffs rely on the affidavit of Anthony Robbins, averring: (1) Plaintiffs always communicated their intention to remodel Cromwell Drive before moving in; and (2) "[it] was clear that the remodeling to the home on Cromwell Drive would be extensive and would take more than sixty days." (Doc. 42-2 at 3). Even accepting the Plaintiffs' version of events, this inferential oral understanding fails in light of the explicitly contradictory Occupancy Requirement. *See Purcell Corp.*, 971 F.2d at 1564. Indeed, the Mortgage contemplates circumstances could arise in which the Occupancy Requirement would not apply but provided Cenlar

would have to agree to any waiver in writing. (Doc. 39-1 at 6). No such agreement exists here.

Plaintiffs also suggest Cenlar acted inappropriately in other ways. First, Plaintiffs complain Cenlar communicated via letters addressed to Cromwell Drive instead of by sending letters to Mr. Erdberg's law firm or attempting to reach Plaintiffs by telephone. (Doc. 42 at 12). However, section fifteen of the Mortgage required all notices to be in writing and delivered to Cromwell Drive unless Plaintiffs designated a different notice address in writing. (Doc. 39-1 at 8; *see id.* at 2-3). Plaintiffs do not contend they designated a different notice address. Next, Plaintiffs note Cenlar was the only mortgage servicer which attempted to enforce the Occupancy Requirement. (Doc. 42 at 12-13). Simple chronology defeats this line of reasoning. The Mortgage—executed on June 22, 2016—required Plaintiffs to occupy Cromwell Drive within sixty days. Accordingly, the Occupancy Requirement did not come into effect until August 21, 2016. By that time the Mortgage had already been transferred from Bryant Bank to Cenlar, and Bryant Bank had no basis to enforce this provision of the Mortgage.

Plaintiffs also contend Cenlar's justification for entering and securing Cromwell Drive—that the home was vacant or abandoned—is merely an ex post facto excuse. Instead, Plaintiffs contend Cenlar acted because it erroneously believed Plaintiffs had defaulted on their Mortgage payments. (Doc. 42 at 13-14).

It does seem likely the initial October 22, 2016 "make contact" visit was motivated by Cenlar's mistaken belief that Plaintiffs were in default. But that exterior inspection revealed the uncontested fact that Plaintiffs had breached the Occupancy Requirement. Faced with the inverse situation, at least one Alabama court has held that, if a mortgage provides a legitimate reason to enter and secure a property, the mortgage servicer's motives are immaterial. *Tennant*, 187 So. 3d at 1182 ("it matters not whether a genuine issue of fact regarding whether the house was abandoned remains, because that fact is not material to determining whether Chase properly exercised its right to enter the house based the Wade's default").

Moreover, Plaintiffs' contention that non-occupancy did not motivate Cenlar's decision to secure the property is belied by the record. Cenlar's October 25, 2016 letter noted it would secure Cromwell Drive due to vacancy. (Doc. 39-3 at 2). Accordingly, Plaintiffs' suggestions that Cenlar acted improperly are without merit. For all of the foregoing reasons, Plaintiffs' reliance on parol evidence does not save their trespass claims. Because Plaintiffs do not dispute their failure to satisfy the Occupancy Requirement, the Mortgage gave Cenlar—and its agents, Creditsouth and Five Brothers—the right to enter and secure Cromwell Drive.

Finally, Plaintiffs contend, even if the Mortgage gave Cenlar the right to enter and secure Cromwell Drive, Cenlar exceeded that authority by damaging the carport door and affixing the notice stickers. (Doc. 42 at 15-16). Regarding the

door, Plaintiffs contend it was "damaged" but do not explain how. (Doc. 42 at 15; Doc. 42-3 at 4; Doc. 42-6 at 4). Cenlar contends, and Plaintiffs have not contested, the only door damage alleged was that the locks were changed. (Doc. 39 at 5; Doc. 45 at 10; *see* Doc. 40-1 at 17-18). The Plaintiffs' April 17, 2017 motion seeking a protective order supports this characterization. (Doc. 18 at 2 ("the property damage claimed by the Plaintiffs is limited to the door whose lock was changed . . . . No other property damage is claimed by Plaintiffs . . . ."); *id.* at 4 ("the door and locks [] make up the basis of Plaintiffs' claims of property damage")). Likewise, photos of the door before and after the locks were changed do not reveal any damage. (Doc. 40-4 at 14-16; Doc. 39-6 at 180-189). Because the Mortgage specifically allowed it, changing locks does not give rise to trespass liability.

Regarding the notice stickers affixed to the exterior of the Cromwell Drive House, the Mortgage also provides that Cenlar could provide written notice of securing the property and contemplated delivering or leaving notices at that location. (Doc. 39-1 at 6 ("Lender shall give Borrower notice at the time of or prior to an interior inspection specifying such reasonable cause"); *id.* at 8 ("All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other

means."))[6]  Accordingly, affixing the stickers did not exceed the authority granted in the Mortgage.  More fundamentally, the stickers in no way interfered with Plaintiffs' "right of possession or entry" and thus do not constitute a trespass. *Boyce,* 941 So. 2d at 945.

For all of the foregoing reasons, there are no genuine issues of material fact, and Cenlar is entitled to judgment as a matter of law on the trespass claim. Because the Mortgage extended to Cenlar's agents—Creditsouth and Five Brothers—the right to secure the Property, all of Plaintiffs' trespass claims fail as a matter of law.

### B.    Invasion of Privacy

Under Alabama law, invasion of the right of privacy in the context of a creditor's actions towards a debtor is "the wrongful intrusion into one's private activities in such manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Liberty Loan Corp. of Gadsden v. Mizell,* 410 So. 2d 45, 47 (Ala. 1982) (quoting *Norris v. Moskin Stores, Inc.*, 132 So. 2d 321 (Ala. 1991).  At first blush, this inquiry would appear to be a question of fact for a jury.  However, numerous courts have granted summary judgment to creditors facing invasion of privacy claims under Alabama law.  Alabama courts:

> have only recognized intrusion cases in the mortgage servicing context for "hounding the plaintiff," *Hope v. BSI Fin., Inc.,* 5:12–cv–

---

[6] As previously noted, Cromwell Drive was the notice address.  (Doc. 39-1 at 8; *see id*. at 2-3).

00736–AKK, 2012 WL 5379177, at *5 (N.D. Ala. Oct. 26, 2012), with "repeated conduct equating deliberate harassment or systematic campaigns designed to vilify the debtor or expose him to public ridicule." *Mizell,* 410 So.2d at 48.

*Deutsche Bank Tr. Co. Americas v. Garst*, 989 F. Supp. 2d 1194, 1206 (N.D. Ala. 2013) (alterations incorporated). "The mere effort . . . to collect a debt cannot without more be considered a wrongful and actionable intrusion." *Norris v. Moskin Stores, Inc.*, 132 So. 2d 321, 323 (Ala. 1961). "[T]he Alabama Supreme Court has 'recognized the right of a creditor to take reasonable action to pursue a debtor and collect a debt.'" *Shuler v. Ingram & Assocs.,* 441 F. App'x 712, 720 (11th Cir. 2011) (quoting *Jacksonville State Bank v. Barnwell,* 481 So. 2d 863, 865 (Ala. 1985)). Moreover, "efforts to collect a debt may be annoying, embarrassing, and upsetting without rising to the level of an invasion of privacy." *Leahey v. Franklin Collection Serv.*, 756 F. Supp. 2d 1322, 1327-28 (N.D. Ala. 2010).

Courts granting summary judgment in this context typically have focused on the sparse and/or routine nature of the creditors' conduct. *See Garst*, 989 F. Supp. 2d at 1206 (granting mortgage servicer's motion for summary judgment where communications were not threatening and were directed exclusively to the debtor); *Westbrook v. NASA Fed. Credit Union*, No. 17-534-AKK, 2018 WL 2065008, at *3 (N.D. Ala. May 3, 2018) (granting motion for summary judgment where creditor wrongly attempted to repossess plaintiff's late husband's automobile and would not allow her to retrieve personal effects from the vehicle, despite fact that

note was not in default); *Mizell*, 410 So. 2d at 47-48 (granting summary judgment where creditor sent notices of delinquency, called debtor's home, and office and filed a lawsuit and process server obtained debtor's address from property manager and left a message on debtor's apartment door: conduct not "calculated to offend a person of ordinary sensibilities"); *Thompson v. Resurgent Capital Servs., L.P.*, No. 12-01018-JEO, 2015 WL 1486974, at *25 (N.D. Ala. Mar. 31, 2015), *order clarified*, 2015 WL 12681653 (N.D. Ala. July 17, 2015) (granting summary judgment on invasion of privacy claim where creditor sent a total of four letters and made one telephone call to debtor over four month period).

Here, Plaintiffs' claims for invasion of privacy focus on the orange notice stickers placed on the exterior of the home announcing the utilities had been disconnected. (Doc. 41 at 23; Doc. 43 at 21; *see* Doc. 42 at 17-18). Plaintiffs contend these stickers wrongfully announced to their neighbors that they had defaulted on the Mortgage, causing embarrassment and exposing them to public ridicule. (Doc. 41 at 23; Doc. 43 at 21; *see* Doc. 42 at 17-18). Plaintiffs further argue the defendants announced the implication that the Mortgage was in default when it was not. (Doc. 41 at 23; Doc. 43 at 21; *see* Doc. 42 at 17-18).

First, as noted above, while it is true Plaintiffs made all payments required under the Mortgage, it is uncontested that Plaintiffs did not satisfy the Occupancy Requirement. Accordingly, the Mortgage gave the defendants the right to enter

and secure Cromwell Drive due to the Plaintiffs' breach. Turning to the stickers affixed to the exterior of Cromwell Drive, photographic evidence reveals orange stickers appearing to be smaller than a 3" x 5" index card and bearing the following text: "NOTICE: THE DOMESTIC WATER SYSTEM HAS BEEN SHUT OFF AND WINTERIZED IN ACCORDANCE WITH INVESTOR AND/OR INSURER GUIDELINES." (Doc. 40-2 at 19; Doc. 40-4 at 23). The stickers also bore a Five Brothers logo and telephone number, said "Default Management Solutions," and noted the home was winterized on November 1, 2016. (Doc. 40-2 at 19). Cenlar describes these notice stickers as "customary," and Creditsouth states it uses the stickers provided by Five Brothers to give notice the residence was winterized and provide information about how to contact Five Brothers. (Doc. 45 at 12; Doc. 44-1 at 3). Plaintiffs have not contested these descriptions.

Creditsouth placed the stickers on the exterior of the Cromwell Drive Home on a single occasion on November 1, 2016. This conduct is clearly not the sort of repeated "hounding" which has sustained debtors' claims for invasion of privacy. *Hope,* 2012 WL 5379177, at *5. Additionally, even construing the facts in the light most favorable to Plaintiffs, under Alabama law a one-time placement of customary notices on the outside of a residence does not qualify as a "systematic campaign[] designed to vilify the debtor or expose him to public ridicule." *Garst*, 989 F. Supp. 2d at 1206. Indeed, creditors may take reasonable actions—even

"annoying, embarrassing, and upsetting" actions—without facing invasion of privacy liability. *Leahey,* 756 F. Supp. 2d at 1327-28.

For all of the foregoing reasons, there are no genuine issues of material fact, and Creditsouth and Five Brothers are entitled to judgment as a matter of law on Plaintiffs' claims for invasion of privacy.[7]

## C.    FDCPA

The sole remaining FDCPA claim is aimed at Creditsouth.  To sustain this claim, Plaintiffs must establish Creditsouth is a "debt collector" under the FDCPA. *Janke v. Wells Fargo and Co.*, 805 F. Supp. 2d 1278, 1281 (M.D. Ala. 2011).  The FDCPA defines a debt collector as an entity engaged "in any business the principal purpose of which is the collection of any debt" or which "regularly collects or attempts to collect, directly or indirectly, debts owed or due another."  15 U.S.C. § 1692a(6).  Relying on the affidavit of its president, Creditsouth contends it: (1) is a property preservation company, which generally works for mortgage companies and banks to secure vacant, foreclosed, or defaulted property; (2) is not in the business of debt collection; and (3) does not "in any way attempt to collect debts." (Doc. 38-1 at 13-14; *see* Doc. 38-2 at 3, 4).  Accordingly, Creditsouth asserts it is not a debt collector for purposes of the FDCPA.  (Doc. 38-1 at 13-14).

---

[7] For the same reasons, even if the FAC had stated a plausible invasion of privacy claim against Cenlar, it would not have survived Cenlar's motion for summary judgment.  (*See* Doc. 39 at 9-12) (briefing invasion of privacy claim that was still pending when motion for summary judgment was filed).

Additionally, Creditsouth notes it never engaged in any communications with Plaintiffs. (Doc. 44 at 11-12).

In response, Plaintiffs contend Creditsouth is a debt collector under the FDCPA because it is in the business of enforcing security interests on behalf of mortgage servicers. (Doc. 43 at 22-23) (citing 15 U.S.C. §§ 1692a(6), 1692(f)(6)(A)). Because Plaintiffs were current on their payments under the Mortgage, they contend Creditsouth violated portions of the FDCPA by taking "nonjudicial action to effect dispossession or disablement of property" where there was "no present right to possession of the property claimed as collateral through an enforceable security interest." (Doc. 43 at 23) (quoting 15 U.S.C. § 1692f(6)(A)).

Plaintiffs' argument fails because, as noted above in section IV.A., Cenlar and its agents—including Creditsouth—had the legal right to secure the Cromwell Drive House due to the Plaintiffs' failure to comply with the Occupancy Requirement. Moreover, Creditsouth is not liable as a debt collector under the FDCPA because the Mortgage was not in default at the time that Cenlar acquired it. 15 U.S.C. §1692a(6)(F) (excluding from liability an entity collecting another's debt where the debt "was not in default at the time it was obtained"). Accordingly, there are no genuine issues of material fact and Creditsouth is entitled to judgement as a matter of law on the FDCPA claim.

### D.    Negligence and Wantonness

A plaintiff asserting a negligence claim must show a breach of the duty of reasonable care, proximately causing damage. *Crown Invs., Inc. v. Bryant*, 638 So. 2d 873, 878 (Ala. 1994). Here, because the initial secure was permissible under the Mortgage due to Plaintiffs' breach of the Occupancy Requirement, any claim for negligence resets on Creditsouth's actions during its November 1, 2016 entry of the Property. (Doc. 41 at 19-21; *see* Doc. 43 at 18-20). In particular, Plaintiffs point to the damage to the carport door and placement of the orange notice stickers on the exterior of the home. (Doc. 43 at 18-19).

As to the notice stickers, Plaintiffs contend the stickers caused them mental anguish and emotional distress. However, because the initial secure was permissible under the Mortgage, Creditsouth had no duty to protect Plaintiffs from whatever embarrassment the notice stickers caused them. *Cf. Hunt v. 21st Mortg. Corp.*, No. 12-2697-WMA, 2014 WL 426275, at *8 (N.D. Ala. Feb. 2, 2014) (no legal duty to refrain from making irritating phone calls). Additionally, the stickers do not support negligence damages for Plaintiffs' embarrassment. *Id.* Regarding the door, as previously discussed in section IV.A., the only damage consisted of changing the locks. (*See* Doc. 40-1 at 17-18; Doc. 18 at 2, 4; Doc. 40-4 at 14-16; Doc. 39-6 at 180-89). Because Plaintiffs breached the Mortgage, which

specifically allowed for changing locks, this does not constitute the damage required to maintain a negligence claim.

Next, wantonness is "the conscious doing of some act or omission of some duty under knowledge of existing conditions, while conscious that from the doing of such act or omission of such duty injury will likely or probably result." *Sellers v. Sexton,* 576 So. 2d 172, 175 (Ala. 1991); *see* ALA. CODE § 6-11-20. The "injury" prong of the wantonness test mirrors that of negligence. *Hunt,* 2014 WL 426275, at *9. For the same reasons discussed above, neither changing the locks on the carport door nor applying stickers is an injury for purposes of wantonness.

Accordingly, there are no genuine issues of material fact, and Creditsouth is entitled to judgement as a matter of law on the claims for wantonness and negligence. Because any liability on the part of Five Brothers would flow through Creditsouth, the same is true regarding negligence and wantonness claims against Five Brothers.

### E. <u>Negligent and/or Wanton Training and Supervision</u>

Finally, a "plaintiff alleging defects in hiring, training, and supervision must prove an underlying tort, i.e., the underlying wrongful conduct." *Henry v. Allied Interstate, Inc.*, No. 12-0128-SLB, 2015 WL 877719, at *8 (N.D. Ala. Mar. 2, 2015) (citing *Shuler,* 441 F. App'x at 720). Because all of Plaintiffs' underlying

claims fail, the claims for negligent or wanton training and supervision fail as a matter of law.

## V.  CONCLUSION

For all of the foregoing reasons, there are no genuine issues of material fact, and the defendants are entitled to judgment as a matter of law as to all claims presented in this matter.  Accordingly, the pending motions for summary judgment will be granted.  (Docs. 38, 39, 40).  A separate order will be entered.

**DONE** this 1st day of March, 2019.

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE